

# Notice of Service of Process

**null / ALL**
**Transmittal Number: 33660575**
**Date Processed: 03/30/2026**

| | |
|---|---|
| **Primary Contact:** | Joani Tadrick<br>V.I.P. Mortgage, Inc.<br>9221 E Via de Ventura<br>Scottsdale, AZ 85258-3370 |
| **Electronic copy provided to:** | Angie Groleau<br>Nancy Pickover<br>Hillary Buckner |

| | |
|---|---|
| **Entity:** | V.I.P. Mortgage, Inc.<br>Entity ID Number  3219140 |
| **Entity Served:** | V.I.P. Mortgage, Inc. |
| **Title of Action:** | Ho'olaeakawaiopua Andrade vs. V.I.P. Mortgage, Inc. |
| **Matter Name/ID:** | Ho'olaeakawaiopua Andrade vs. V.I.P. Mortgage, Inc. (18988108) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Labor / Employment |
| **Court/Agency:** | Circuit Court of the Third Circuit, HI |
| **Case/Reference No:** | 3CCV-26-0000014 |
| **Jurisdiction Served:** | Hawaii |
| **Date Served on CSC:** | 03/27/2026 |
| **Answer or Appearance Due:** | 20 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Ted H. S. Hong, Attorney At Law, LLLc<br>808-933-1919 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

**EXHIBIT A**

TED H.S. HONG, #3569
Attorney at Law
101 Aupuni Street, PH 1001A
P.O. Box 4217
Hilo, Hawaii 96720
Telephone: (808) 933-1919
Ted@Tedhonglaw.com

**Electronically Filed**
**THIRD CIRCUIT**
**3CCV-26-0000014**
**08-JAN-2026**
**04:00 PM**
**Dkt. 1 CMPS**

Attorneys for Plaintiff
HO'OLAEAKAWAIOPUA ANDRADE

## IN THE CIRCUIT COURT OF THE THIRD CIRCUIT

## STATE OF HAWAII

| | |
|---|---|
| HO'OLAEAKAWAIOPUA ANDRADE, ) <br><br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> V.I.P. MORTGAGE, INC.; JOHN DOES ) <br> 1-10; JANE DOES 1-10; DOE ) <br> PARTNERSHIPS 1-10; DOE ) <br> CORPORATIONS 1-10; DOE ) <br> GOVERNMENTAL AGENCIES AND ) <br> DOE ENTITIES 1-10; ) <br> ) <br> Defendants. ) <br> ) | CIVIL NO. _____ <br> (Other Tort Action) <br><br> VERIFIED COMPLAINT; EXHIBITS "1," <br> - "3;" VERIFICATION OF <br> HO'OLAEAKAWAIOPUA ANDRADE; <br> DEMAND FOR TRIAL BY JURY; <br> SUMMONS |

## VERIFIED COMPLAINT

COMES NOW Plaintiff, HO'OLAEAKAWAIOPUA ANDRADE ("Plaintiff"), by and through her attorney, Ted H.S. Hong, and hereby submits her Verified Complaint against Defendant V.I.P. MORTGAGE, INC. ("Defendant"), hereby states and alleges as follows:

### I. PARTIES

1. Plaintiff, HO'OLAEAKAWAIOPUA ANDRADE ("Plaintiff"), is a resident of the County of Hawaii, State of Hawaii.

2. Defendant, V.I.P. MORTGAGE, INC., is at all relevant times mentioned in this Verified Complaint, is a Foreign Profit Corporation and is organized and exists under the laws of the State of Hawaii and does business in the County of Hawaii, State of Hawaii.

I do hereby certify that the foregoing is a full, true and correct copy of the official court record of the Courts of the State of Hawai'i. Dated at: Hilo, Hawai'i 08-JAN-2026, /s/ Cheryl Salmo, Clerk of the Third Judicial Circuit, State of Hawai'i



3. Defendants JOHN DOES 1-10, JANE DOES 1-10, DOE PARTNERSHIPS 1-10, DOE CORPORATIONS 1-10, DOE GOVERNMENTAL ENTITIES 1-10, AND DOE ENTITIES 1-10, are sued herein under fictitious names for the reason that, after thoroughly investigating the facts of the action, said Defendants' true names and identities are presently unknown to the Plaintiff, except upon information and belief, that they are connected in some manner with the named Defendant and/or were the agents, servants, employees, employers, representatives, co-venturers, associates, vendors, suppliers, manufacturers, distributors, sub-contractors or contractors and/or owners, lessees, assignees, licensees, of the named Defendant and/or were in some manner presently unknown to the Plaintiff engaged in the activities alleged herein and/or were in some manner responsible for the injuries or damages to the Plaintiff which was a proximate cause of injuries or damages to the Plaintiff and that their "true names, identities, capacity, activities and/or responsibilities" are presently unknown to the Plaintiff or his attorney. To ascertain the full names and identities of JOHN DOES 1-10, JANE DOES 1-10, DOE PARTNERSHIPS 1-10, DOE CORPORATIONS 1-10, DOE GOVERNMENTAL ENTITIES 1-10, AND DOE ENTITIES 1-10, Plaintiff's counsel has investigated the facts alleged herein through *inter alia* interview of the Plaintiff and the records and files submitted by the Plaintiff. When the true names and capacities are ascertained, through appropriate discovery, the Plaintiff shall move to amend this Verified Complaint to state their true names.

## II. JURISDICTION

4. Plaintiff repeats and realleges the allegations in paragraphs 1 – 3 of the Verified Complaint, and incorporates the same by reference as though set forth fully herein.

5. This Verified Complaint is brought pursuant to Sections 603-21.5(a)(3), 634-35(a)(1), and (2), Hawaii Revised Statutes (hereinafter referred to as "HRS").

6. Venue is proper in this Court under Section 603-36(5), HRS, as the alleged events arose from actions and/or omissions between the Plaintiff and Defendant arose in this judicial circuit.

## III. FACTS

7. Plaintiff repeats and realleges the allegations in paragraphs 1 – 6 of the Verified

2

Complaint, and incorporates the same by reference as though set forth fully herein.

A. Background.

8. The Plaintiff is highly educated:

a. From 1994 through and including 1997, the Plaintiff attended Eastern Oregon University and received her Bachelor of Science Degree in Business Economics, Accounting and Finance;

b. From 1992 through and including 1994, the Plaintiff attended Chaminade University and studied Criminal Justice and Accounting.

9. The Plaintiff has approximately twenty-two (22) years in the Mortgage and Lending Industry including:

a. 2024 to the present: Current Owner and CEO of Pacific Isle Lending Group, LLC, where the Plaintiff manages loan officers for home buyers and home owners on Hawaii Island and in the State of Hawaii.

b. 2018 to 2024: Recruited away from her own company, the Plaintiff became the Senior Vice President and Regional Manager Hawaii for V.I.P. Mortgage, Inc., where she was responsible for operations and recruiting in the State of Hawaii. She led the lending officers and operations staff. She was included and participated in the recruit operations at the corporate level. She was also responsible for monthly financial reports for the Hawaii and Tucson Regions;

c. 2011 to 2018, the Plaintiff was the Owner and CEO of Pacific Isle Lending Group, LLC, and was a top producing loan officer and handled all operations and compliance issues;

d. 2007 to 2011, the Plaintiff was the Branch Manager and Loan Officer for Island Pacific Mortgage, Inc., where she was the top producing Loan Officer and managed the Hawaii Island branch;

e. 2004 to 2007, the Plaintiff was a Loan Officer for Royal Pacific Mortgage, Inc.

B. V.I.P. Mortgage, Inc. ("Defendant").

10. V.I.P. Mortgage, Inc., was founded by Mr. Jay Barbour in 2006 and has grown from a

3

single office with two loan officers in Scottsdale, Arizona, to over 20 brick and mortar branches (across many states, including in Hawaii and the Island of Hawaii) with a few hundred licensed loan officers. V.I.P. Mortgage, Inc. funds several billion dollars in mortgage loans annually.

11. The Plaintiff was heavily recruited to join the Defendant. As early as 2016, Defendant's National Sales Manager, Mr. Jim Kaiser was emailing and meeting with the Plaintiff to convince her to join the Defendant. By July of 2017, the Plaintiff and Defendant were exchanging financial information to determine whether the Plaintiff and her team at her company, Pacific Isle Lending Group, LLC, could join the Defendant corporation. The Plaintiff was reluctant.

12. On April 30, 2018, Defendant's representative, Jim Kaiser enticed the Plaintiff, promising that the Defendant could "double" her company's current earnings. He promised that "we can grow Oahu, Maui, and The Big Island to at least $10mm a month by this time next year." He also promised "you can easily get your income to over $500,000 a year in no time . . ."

13. After going back and forth, on May 3, 2018, Mr. Kaiser promised the Plaintiff even more to join the Defendant including, a compensation package of monthly salary of $16,667, "paid on origination, salary for managing your office and all of the Hawaii Production that we build, and overrides on your own origination and any loan officers that you recruit or currently have. This cannot be tied to profitability." He went on to continue to sweeten the deal, "I truly believe you and I can grow Hawaii to $10mm to $15mm by the end of 2019. . . . I know we can do something in Maui, Kauai, and The Big Island. If we added 1 Or 2 loan officers in Oahu, all of their production would be instant profit. I feel that you and I can build something that we will be proud of and you will have much more flexibility and free time for your family than you currently have."

14. On May 4, 2018, the Defendant scheduled the Plaintiff for a recruitment visit and Mr. Kaiser emailed the Plaintiff, "I am super excited!! If we can get this to $15mm you will make an insane amount of money and have lots of fun!!!"

15. By May 25, 2018, the Plaintiff had some concerns about the employment or "Branch Manager" agreement and sent those on to Mr. Kaiser and Mr. Jay Barbour, Defendant's Owner and President. Mr. Kaiser responded and the Plaintiff was satisfied with the responses and

4

committed to joining the Defendant's corporation.

16. On June 4, 2018, the Plaintiff accepted and signed an employment agreement for the position of Senior Vice President ("SVP") Hawaii Branch Manager and Hawaii Regional Manager and detailed the Plaintiff's compensation package. See, Exhibit "1," attached hereto. The compensation was a mix of salary and productivity of each branch that the Plaintiff would be responsible for.

    a. In relevant part, the terms for compensation included:

5. **Base Salary:**
    a. **200,000.00** a year.
    b. Branch overrides will be set by Ho'O and Jay based on Branch P&L that is provided every month by the 25th of the following month. Branch must show positive numbers in excess of .125 bps.
    c. Recruiting - 5 BPS paid by branch on any additional LO's via our business development team that brings additional LO's to your branch.

Emphasis included.

Exhibit "1," attached hereto.

C. Plaintiff's employment with Defendant.

17. The Plaintiff began her employment with the Defendant on August 29, 2018. She understood her primary role, based on conversations with Mr. Kaiser, was to recruit and build a team in Hawaii.

18. The recruiting model given to the Plaintiff and the teams she was assigned to manage was a Profit and Loss model, that each branch manager would run their own branch and any profit that was earned, less a reserve fund, was paid out to employees, including the Plaintiff.

19. Defendant had a curious practice and custom of requiring the Plaintiff and other executives to sign new employment agreements every quarter. See, Exhibit "2," attached hereto. In each quarterly agreement, the terms and conditions were identical and the Plaintiff was told that the Defendant's reasoning behind quarterly employment agreements was to adjust compensation based on projected production and current earnings, so that earning were spread out and ongoing. She was told it was a "safety feature" for the Defendant and way to adjust compensation packages.

    a. In relevant part, the terms for compensation included:

5

## II.    COMPENSATION & BENEFITS

a.    Manager will receive a base salary **per pay period** in the amount of $8,333.33.

b.    Manager will be compensated on their personal production according to **Schedule A** of their Full Time Loan Officer Employment Agreement.

c.    Manager will receive a **Monthly Override Amount of 75 Bps** on the monthly loan volume with exceeds $3,500,000.00 in loan volume produced by the Hawaii - 55 Branch.  Only Eligible" loans that close and fund by the close of business on or after the 1st day of the month and on or before the last day of a given month are considered toward the Monthly Override Amount.  An "Eligible" is a loan as defined in Schedule A of the Full Time Loan Officer Employment Agreement.

Emphases in original.

Exhibit "2," attached hereto.

20.  During her employment, the Plaintiff directly managed the Waimea and Hilo Branches on the Island of Hawaii.  By the end of her employment, she successfully opened, operated and maintained seven (7) branches in Hawaii.

21.  Based on her exemplary work performance and productivity, the Defendant brought the Plaintiff in to conduct recruitment and building recruit models for all of Defendant's operations throughout the country.

22.  Because of the Plaintiff's productivity and experience, the Defendant also assigned the Plaintiff to take on the financial analysis for the Hawaii and Tucson Regions.  The Plaintiff was given free access to the financial data from the Hawaii and Tucson Regions and worked on and submitted projections and financial systems to corporate executives.  This was in spite of the fact that Mr. Jim Kaiser was the direct corporate manager for both the Hawaii and Tucson Regions.

D.  Defendant's financial difficulties.

23.  On or about October 31, 2023, the Hawaii Region was carrying a profit of $581,918.92.  The Plaintiff began pressuring Defendant's executives for a payout plan for employees because the end of the year was approaching.

6

24. In November of 2023, the Defendant's executives falsely told managers, including the Plaintiff, that the company suffered a financial loss based on loans they had to buy back. The Defendant's executives also falsely subtracted excessive amounts against Branch profits which resulted in wiping out Hawaii Branch earnings in the amount of $373,767.00. The action was a pretext to allow the Defendant to avoid paying out earnings to employees.

25. The Plaintiff and other employees requested supporting documentation regarding the loans that had to be bought back at a loss, however no information was provided. Defendant's adjustment severely reduced the Hawaii Region's profit to $144,899.42. This raised a great deal of concern by employees concerning promises made about an end of year payout.

26. On November 28, 2023, the Plaintiff personally met with the Defendant's President and Owner to discuss her concerns about compensation delays and the Branch profit reductions falsely based on loan buy backs.

27. On November 29, 2023, the Defendant's President and owner told the Plaintiff that the problems about compensation delays and the Branch profit reductions would be resolved by Christmas (2023).

28. Despite the assurances, the Plaintiff was also concerned because as of November 30, 2023, she was owed a total of $298,633.93 based on the profitability of the Waimea Branch ($151,316.75) and the Hilo Branch ($147,317.18).

29. The Plaintiff began asking about a plan to pay the balance owed to her. Instead, the Defendant's executives acknowledged that the Hawaii Region was operating very successfully.

30. In response to the Plaintiff's request and based on Defendant's false justification for transferring money from the Hawaii Branch profits, the Defendant issued a statement to all employees that the payout for the funds the regions had already earned were being postponed until the first quarter of 2024.

31. In late 2023, the Defendant circulated revised employment agreements. The Defendant required employees to sign the new, two year employment agreements in order to receive their income already earned and delayed by the Defendant. The Plaintiff believed this was not the industry standard and had a concern that the Defendant would or could not pay out the income from Branch profits. Defendant's action also caused substantial concern from other

7

employees about the company's future.

32. On or about December 28, 2023, the Plaintiff reiterated to Defendant's executives that the compensation and profit reduction situation had not changed.

33. On or about January 4, 2024, the Defendant terminated the Plaintiff's employment. See, Exhibit "3," attached hereto.

34. In January of 2024, the "pay period" occurred on January 15, 2024 and January 30, 2024.

35. To date, the Defendant has failed to pay the Plaintiff her "Monthly Override Amount" as of November 30, 2023, in the total amount of $298,633.93 based on the profitability of the Waimea Branch ($151,316.75) and the Hilo Branch ($147,317.18).

36. Defendant had until the pay period of January 15, 2024 or January 30, 2024, to tender payment to the Plaintiff her overdue "Monthly Override Amount" as calculated in November 30, 2023.

## IV. CAUSES OF ACTION

## A. COUNT I. - RACKETEERING

37. Plaintiff repeats and realleges the allegations in paragraphs 1 – 36 of the Verified Complaint, and incorporates the same by reference as though set forth fully herein.

38. Defendant VIP Mortgage, Inc., is a "person" under Sec. 842-1, HRS.

39. That all times relevant, Defendant included a group of individuals associated for a particular purpose, and is registered, licensed and operates under the laws of the State of Hawaii, in the County of Hawaii.

40. That at all times relevant, the "particular purpose" was to make several billion dollars in mortgage loans annually including in the State of Hawaii and County of Hawaii.

41. Defendant engaged in "Racketeering Activity," as defined in Section 842-1, HRS, including but not limited to:

    a. That at all times relevant the Defendant committed Theft, pursuant to Sec. 708-830(1), HRS, by intentionally obtaining the Plaintiffs' money, to wit, $298,633.93 and exerted unauthorized control over the funds with the intent to deprive the Plaintiff of the funds, even after the Plaintiff requested payment;

8

and/or

b. That at all times relevant the Defendant committed Theft by failure to make required disposition of funds, pursuant to Sec. 708-830(6)(a), HRS, by obtaining or exerting control over the Plaintiff's funds, to wit, $298,633.93, the Plaintiff earned and subject to a compensation agreement, and failed to make payments upon agreement and request by the Plaintiff, which the parties had been doing since 2018 through and including the Fall of 2023, and Defendant dealt with the Plaintiff's compensation as its own and refused to make the required payment or disposition to the Plaintiff.

Defendant portrays and markets itself as a "financial institution" as defined in Sec.708-800, HRS and was *prima facie* aware of the Defendant's legal obligation to compensate the Plaintiff for work already performed on its behalf.

c. That all times relevant the Defendant was an "enterprise," through a group of individuals associated for a particular purpose, which included defrauding the Plaintiff and conducted or participated in the conduct of the affairs of the enterprise through racketeering activity in violation of Sec. 842-2(3), HRS.

d. That Defendant funded its operations through racketeering activity, including using the funds it kept from the Plaintiff.

## B. COUNT II. - FRAUD

42. Plaintiff repeats and realleges the allegations in paragraphs 1 – 41 of the Verified Complaint, and incorporates the same by reference as though set forth fully herein.

43. Defendant, by and through its President, agents and representative, made false representations regarding the terms and conditions of the compensation agreement between the Plaintiff and Defendant, including but not limited to the compensation to be received by the Plaintiff, according to Producing Branch Manager Employment Agreements.

44. From 2018, when the Plaintiff joined the Defendant's company until the Fall of 2023, the Plaintiff received her earned Monthly Override Amount during pay periods.

45. Defendant was aware that the Plaintiff relied on the representations by Defendant's President, agents and representatives concerning the structure of her compensation and any delay

and/or adjustment would be resolved by Christmas of 2023.

46. Defendant, by and through its agents and representatives, knew that the representations made to the Plaintiff concerning compensation and Monthly Override Amounts owed was false when they met with the Plaintiff on November 28, 2023.

47. At all times relevant, Defendant, by and through its agents and representatives intended that its false representations about the Plaintiff's compensation and Monthly Override Amount agreement would result in Plaintiff continuing to work for and further the Defendant's mortgage lending business.

48. The Plaintiff was detrimentally affected by Defendant's false representation.

## C. COUNT III: UNJUST ENRICHMENT.

49. Plaintiff repeats and realleges the allegations in paragraphs 1 – 48 of the Verified Complaint, and incorporates the same by reference as though set forth fully herein.

50. At all times relevant in the present complaint, the Plaintiff, as Defendant's agent and representative conferred the benefit of her experience and expertise in operating, recruiting and growing the Defendant's business in the State of Hawaii and in the continental United States.

51. The benefit conferred upon the Defendant was the operation, recruitment and growth of the Defendant's business in the State of Hawaii and in the continental United States from which the Defendant gained revenue to continue its operations in Hawaii. *Porter v. Hu*, 116 Hawai'i 42, 55, 169 P.3d 994, 1007, 26 IER Cases 1253, 2007 WL 2898271 (Ct. App. 2007).

52. Defendant is required to compensate the Plaintiff and retaining the Plaintiffs compensation of $298,633.93,would be unjust. Id.

53. Under the equitable remedy of *Quantum Meruit*, the Defendant received the benefit from the Plaintiff's hard work and it is unjust for the Defendant to keep the Plaintiff's rightful compensation, without paying therefor[,]" *Hiraga v. Baldonado*, 96 Hawai'i 365, 372, 31 P.3d 222, 229, 2001 WL 943190 (Ct. App. 2001).

## D. COUNT IV. - CONVERSION

54. Plaintiff repeats and realleges the allegations in paragraphs 1 – 53 of the Verified Complaint, and incorporates the same by reference as though set forth fully herein.

55. From 2018 through and including the Fall of 2023, Defendant knew it would receive

10

revenue for work performed by the Plaintiff and then compensate the Plaintiff every pay period, her base salary and Monthly Override Amount.

56. As of November 30, 2023, Defendant's agent or representative was informed by the Plaintiff, that the Plaintiff was owed her Monthly Override Amount. See, Exhibit "2," attached hereto.

57. The Defendant unlawfully withheld Plaintiff's compensation and Monthly Override Amount keeping it as their own.

**E.  COUNT V. (Negligent Supervision)**

58. Plaintiff incorporates as if realleged, paragraphs 1 through 57, inclusive and incorporates the same by reference as though set forth fully herein.

59. Defendant had a legal duty to supervise Defendant's employee, Jim Kaiser, concerning his behavior at work and prevent him from committing theft of the Plaintiff's compensation.

60. Defendant negligently failed in its legal duty to supervise Mr. Kaiser, concerning the performance of his job, including following personnel laws and policies concerning the workplace safety and violence, including but not limited to:  (1) Kaiser's aggressive, abusive and unfounded threats to the Plaintiff and co-workers; (2) failure to enforce and impose any consequences on Mr. Kaiser for his actions in the workplace; (3) Not compensating the Plaintiff based on the falsehoods and misrepresentations of Mr. Kaiser concerning the Plaintiff's productivity and leadership.

61. Defendant breached its duty of supervising its employee, Mr. Kaiser and prevent him from harassing and/or threatening and/or intimidating and/or harassing co-workers, including the Plaintiff.

62. The Plaintiff put the Defendant on notice on November 28, 2023 in meeting with the President and owner to alert him about Mr. Kaiser's misrepresentations and violations of workplace violence law and policies through email, texts and by phone.

63. Defendant knew or had reason to know of the misconduct of Mr. Kaiser's pattern and practice of misrepresenting circumstances concerning compensation, Monthly Override Amounts and Plaintiff's leadership and successes in growing or expanding the company.

11

64. As a direct, proximate and foreseeable result of Defendant's actions as set forth above, the Plaintiff has sustained special and general damages in amounts to be proved at trial.

65. The Plaintiff suffered damages, including but not limited to, causing the Plaintiff to lose income, suffer severe emotional pain, suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and the physical injury including, loss of weight, loss of sleep, loss of appetite, and other nonpecuniary losses as a direct result of Defendant's negligence.

66. As a direct, proximate and foreseeable result of Defendant's actions as set forth above, the Plaintiff has sustained special and general damages in amounts to be proved at trial including but not limited to, mental and emotional distress, anguish  and humiliation.

## VI.  PRAYER FOR RELIEF

67. Wherefore, Plaintiff prays that this Court:

a. The Plaintiff be awarded against Defendants general and special damages in amounts to be shown at trial; and

b. Award Plaintiff compensatory damages against the Defendants; and

c. Award Plaintiff's costs and attorney's fees; and

d.  Award Plaintiff any pre and post judgment interest; and

e. Grant such other relief as it may deem just and proper.

DATED:        Hilo, Hawaii, January 8, 2026

Respectfully submitted,

/s/ Ted H. S. Hong
Attorney at Law

Attorney for Plaintiff
HOʻOLAEAKAWAIOPUA ANDRADE

12

# EXHIBIT "1"



Dear Ho'O,

On behalf of V.I.P. Mortgage, Inc., I would like to extend a most cordial welcome to you. VIP is a leader in the mortgage industry, serving the needs of real estate professionals, builders, and individual homebuyers in several states. We look forward to having you join our experienced staff to help offer expertise in every area of mortgage lending.

**Position Title: SVP Hawaii Branch Manager and Hawaii Regional Manager**

1. **Loan officer marketing**
   a. **Video's about the them moving, that hit social media**
   b. **Corporate marketing support on just moved hits to all data base.**
2. **Loan officer retention bonus for 12 months 10 bps from branch**
   a. **Adjust this number if you want?**
3. **Loan officer Presidents Club 2017**
   a. **30,000,000 Million or 120 purchase units**
4. **Loan officer 90 day party for all past clients, agents and referral partners.**
   a. **Corporate will credit branch P&L $2,000.00**
5. **Base Salary:**
   a. **200,000.00** a year.
   b. Branch overrides will be set by Ho'O and Jay based on Branch P&L that is provided every month by the 25th of the following month. Branch must show positive numbers in excess of .125 bps.
   c. Recruiting – 5 BPS reduction paid by branch on any additional LO's via our business development team that brings additional LO's to your branch.
6. **Expense Reporting:** Ability to expense applicable IRS tax code deductions.
   a. Monthly report to include items such as coaching, marketing, closing gifts, etc. The applicable dollars are fully reimbursed in cash, and deducting from gross commissions with Pre-Tax dollars for LO's or can be charged against the branch if branch is profitable.
7. **Signing Bonuses:**
   a. Ho'O will receive $10,000.00.
      i. $5,000.00 paid on 6/30/18 and 7/15/18
8. **BD/Marketing:**
   a. Corporate will credit $2,000.00 to branch P&L.
9. **Ownership Opportunity:** Ability to purchase private stock in the following entities.
   a. VIP Mortgage Inc.
      i. Current Stock price is $266.63 for one share
         1. VIP current value is $13,331,471.00
   b. VIP Insurance Services
      i. Current stock price is $1.00 a share with max purchase of $20,000.
         1. Book value based on total revenue for 2017 $1.5 MM
   c. VIP Corporate office located at 9221 E Via De Ventura, Scottsdale, AZ
      i. Share price has not been set until we are completely done with build out.
         Estimated buy-in value will be $4,600,000.00 with appraised value of $7,752,000.00.
10. **Benefits of moving to VIP Mortgage Inc.:**
    a. **Exclusive Club and Company Culture**
    b. Having VIP able to work files that are turned by end of business each day to have a complete needs list by noon the next day by using corporate services to work off the clock.
    c. LO's have the ability to have multiple comp plans
    d. **In House Marketing Company helping grow your business**
    e. Reverse Mortgage Department in house from A to Z

## EXHIBIT "1"

    **f.** We use Mercury Network to be able to manage appraisers in house without the use of an AMC. It has compliance features built in so we are still within AIR guidelines. The appraisal department uses the system and manages the appraisals within Mercury. We have been using the system for almost 2 years and things are going great!

    **g.** Ability to deliver to all Agencies

    **h.** SPEAR CRM system built on SalesForce

    **i.** In House Company Coach-Driven Coaching

    **j.** Full time Business Development helping LO's and Branch grow

        i. Jim Kaiser

**Summary**

VIP Mortgage, Inc. is seeking a motivated and experienced Executive Branch Manager Team. The Team will oversee a specified Branch and includes a high level of responsibility. The Team will be responsible for the oversight and development of branches Loan offices and all support staff. The Team will lead all aspects of sales activity for the sales team such as: deal structuring, coaching, monthly meeting with each staff member ensuring that they are being supported and align with the VIP culture of HEART, recruiting, marketing programs, succession planning, training and execution of new sales techniques.

**Essential Job Functions:**

- Designing and recommending sales and marketing programs; create and implement sales vision and strategy for Branch loan officers
- Establish and implement long-term and short-term sales strategies for your branch and the Hawaii Region.
- Recruiting new sales staff and participating in the interview process.
- Leads and directs the Loan officers to achieve sales and profit goals within their branch.
- Coaches and mentors staff and LO's within the branch and all employees.
- Review objectives of the branch and sales personnel.
- Review training requirements as necessary.
- Evaluate current techniques; design and execute new sales techniques to increase the sales volume.
- May recommend product or service enhancements to improve customer satisfaction and sales potential.

This offer of employment is contingent upon:

- Documentation establishing your identity and eligibility to work in the United States, as required by the immigration Reform and Control Act of 1986;
- Results of a criminal background and credit check.

While we hope that your employment with VIP will be long-standing, you should understand that your employment is "at will." This means that you or VIP may terminate your employment at any time, with or without notice, and with or without cause. Nothing in this letter, any application material or any other oral or written representation constitutes a contract of employment.

**Please send back a signed copy of this letter within 48 hours of the date at the top.** Should you have any questions about starting with VIP, please do not hesitate to contact me at **480-776-2954**. We look forward to having you become a member of our team.

Sincerely,
Jay Barbour, President

Agreed and Accepted
By:_____     Date:___6/4/18_____

**EXHIBIT "1"**

# EXHIBIT "2"

**V.I.P. MORTGAGE, INC.**
**PRODUCING BRANCH MANAGER**
**EMPLOYMENT AGREEMENT**

THIS EMPLOYMENT AGREEMENT, made and entered into this ___2nd___ day of ___January___, 2020, is made by and between V.I.P. Mortgage, Inc., its predecessors, successors, assigns and subsidiaries (collectively "Employer" or "Company" or "VIP"), and Ho'olaeakawaiopua Andrade ("Employee", "Manager" or "Loan Officer") (collectively the "Parties").

**I.      DUTIES**

**A. Subject** to the ultimate supervision, direction and control of Company, Manager will be responsible for the day to day operations of the Branch.  This includes, but is not limited to:

i)      remaining familiar with and ensuring that all loans originated by the Branch are handled in accordance with the Company's policies, guidelines, quality control, applicable federal, state, and local laws, and investor guidelines;

ii)      ensuring that all proper documentation is prepared, kept and maintained in accordance with all applicable laws, and is readily available for inspection at Company's discretion;

iii)  informing the Company immediately of any and all events, incidents, occurrences, complaints, lawsuits, investigations, findings, or good faith concerns of illegal, improper, or unethical or other material information or matters concerning the Company and/or Branch operations;

iv)      informing Company of all expenses on a timely basis in order to ensure prompt payment thereof;

v)      forwarding all fees, checks, deposits, etc. in the possession of Manager to Company's Corporate Headquarters in a timely manner;

vi)      ensuring that all closed loan documents are stored in Company's document storage system and accessible to Company upon demand;

vii)      hiring, developing, maintaining, training and supervising a sales force of loan originators and support staff to maximize Branch profit and minimize risk;

viii)      ensuring that all persons performing any services for the Company through the Branch are Company Employees, properly licensed and registered, as applicable, and are approved to start by Company and, as applicable approved by the Company to originate loans.

ix)      ensuring that all advertising and marketing is done only with the pre-approval of Company and that all telemarketing is performed in accordance with Company guidelines for use of the Do Not Call list and is in compliance with Federal and State rules.

x)      ensuring that all websites  or other social media used by the Branch or any Branch Employee that relate in any way to financing residential real estate are approved by the Company prior to posting to/access by the general public.

xi)      ensuring that any and all email communications on behalf of Company shall be sent from and directed through corporate email.  Private email is not to be used for any official Company business.

xii)      ensuring that all borrowers are advised of the most appropriate financing options, are not steered to products based on maximizing compensation, and are only advised to close loans if there is a good faith basis to believe that the borrower will be able to re-pay the loan.

**B.   Notwithstanding** any provision of this Agreement to the contrary, without the prior written consent of Company, **Manager is not authorized** on behalf of Company to:

i)   sell, lease, trade, exchange or otherwise dispose of any capital asset of the Company;

ii)   grant a security interest in, hypothecate or otherwise encumber any asset of Company;

iii)   incur any debt, sign any lease, or borrow money in the name of or on behalf of the Company;

iv)   confess a judgment against the Company or settle or compromise in any manner any legal action, claim or litigation in the name of the Company brought by or against the Company, nor may Employee take any action in furtherance of any attempt to accomplish such actions without the Company's prior knowledge and consent;

v)   implement material changes to the operation of the Branch;

vi)   open any bank, savings, credit, or investment account in the name of Company or any DBA, parent, subsidiary or affiliate thereof;

vii)   deposit, cash, endorse, transfer or negotiate any check, instrument, draft or other payment payable to or intended for Company;

viii)   acquire or attempt to acquire any signature rights to any of the aforementioned accounts, nor may Manager open any account in the name of or a name similar to the foregoing;

ix)   accept any funds or wire transfers intended or for the benefit or on behalf of the Company;

x)   conduct any Realtor activities or hold an active Realtor license during the period of employment or permit or allow other Loan Officers of the Company to engage in such activities;

xi)   pay any expenses for the branch out of any personal funds, or pay or promise payment to any person for services associated with the origination or processing of loans, who is not an approved Employee of the Company;

xii)   issue or allow others to issue a commitment of financing without proper prior underwriting approval;

xiii)   undertake any financing or origination of loans in contravention of Company policies, including but not limited to straw financing, flip financing, or the transfer of loans from or to Company without proper approval;

xiv)   deviate from approved compensation plans for any Loan Officers or other Employees;

xvi)   encourage or permit Loan Officers to steer customers toward particular loans for the purpose of maximizing revenue at the expense of customers' interests and/or facilitate or encourage lending to consumers in the absence of any good faith belief that the borrower is able to repay the loan;

xvii)   encourage or permit any actions that result in lending to consumers under false pretenses, or put Company at risk for early pay-off, early payment default, repurchase or recapture.

xviii)    use the Company's name except in furtherance of his/her duties on behalf of the Company.  Manager has no ownership or other usage rights with respect to the Company's name and upon termination of this Agreement, Manager shall cease using the name "VIP Mortgage" or any semblance thereof.

**II.    <u>COMPENSATION & BENEFITS</u>.**

**a.**  Manager will receive a base salary **per pay period** in the amount of _____8,333.33_____.

**b.**  Manager will be compensated on their personal production according to **Schedule A** of their Full Time Loan Officer Employment Agreement.

**c.**  Manager will receive a **Monthly Override Amount of** __75__**Bps** on the monthly loan volume which exceeds _____3,500,000.00_____ in loan volume produced by the _____Hawaii - 55 Branch_____.  Only " Eligible" loans that close and fund by the close of business on or after the 1st day of the month and on or before the last day of a given month are considered toward the Monthly Override Amount. An "Eligible" is a loan as defined in Schedule A of the Full Time Loan Officer Employment Agreement.

**d.**  Strategic Performance Pay Plan:
Compensation will be based on the VIP Score Card and management feedback. This plan is not measurable.   Loan officers will be eligible for the bonus pool and potentially receive this bonus the last pay periods in April, July, October, and January.  The eligibility for compensation is based on performance in the following areas: loan accuracy, completeness, pull through, long-term loan performance, retention, and team work / attitude.  The maximum bonus a Loan Officer can receive for the Strategic Performance Plan is equal to 10% of the amount earned by the Loan Officer over the time period for which the bonus applies/is calculated.  A Loan Officer must originate a minimum of **9** loans a quarter to be eligible for bonus.

**e.**  Employee agrees that within 30 days of the receipt of any commission or bonus checks, he/ she will bring to Employer's attention, in writing, any and all objections, disputes, or concerns regarding omissions or errors in connection with the commission/bonus paid. Employee understands that if no such written dispute is initiated, Employee's silence constitutes an acknowledgement that the commission/bonus was properly calculated.

**f.**  For loans originated by Employee that are closed and funded, while Employee is employed by Company and subject to all terms and conditions set forth herein, Employee shall receive commission in accordance with the commissions schedule based upon Employee's monthly closed loan volume, attached hereto as Schedule A.  An "Eligible Loan" is defined as a residential mortgage loan (a) that is originated in accordance with Applicable Requirements; (b) that is closed and funded in accordance with Applicable Requirements, in the period in which the Commission is calculated; (c) that is not unfunded, cancelled or rescinded for any reason within [five (5)] days after settlement; and (d) for which the period for any Early Payment Default and Early Pay Off has expired.

**g.**  <u>Advanced Amounts; Early Pay Offs and Early Payment Defaults</u>.  Employee is only considered to have earned and be entitled to payment of a Commission Amount on Eligible Loans. If an originated loan that has closed and been funded becomes subject to an Early Pay Off or Early Payment Default, the loan is not an Eligible Loan under this Agreement, and Employee may not be entitled to a Commission Amount on such loan.  Notwithstanding the foregoing, Company may advance Commission Amounts for all Eligible Loans that meet (a), (b) and (c) of the Eligible Loan definition, as applicable, in the next payment cycle.  If the Commission Amount has been advanced on a loan that later results in an Early Pay Off or Early Payment Default, Employee may owe Company the amount advanced to the Employee on such ineligible loan.  In such case, subject to applicable law, Company will reduce the amount of any such unearned advancement from the next Commission Amount payment to Employee.

---

January 2020                Initials/____                                                Page 3

**EXHIBIT "2"**

Notwithstanding the foregoing, in no case will Employee receive less than the applicable minimum wage for any hours worked in each work week during the employment period.

An "Early Payment Default" occurs when a loan becomes sixty (60) days or more past due within 12 months of the first payment due date.

An "Early Pay Off" occurs when a loan is repaid in full for any reason within (a) 6 months of the date of the note or (b) the timeframe as defined by the applicable investor agreement to which the loan was transferred and/or sold.

**h.** <u>Prospective Compensation Adjustments</u>   Employee's compensation will not as a matter of course be reviewed or adjusted, and may not be adjusted more than once in any 90 day period. In the event an Employee's compensation is evaluated for adjustment, a variety of criteria including pull through rate, quality of loan files, loan volume, overall sources of origination, loan performance, any relevant competitive forces impacting Employee's customer base, and any relevant macroeconomic trends will be reviewed.  Notwithstanding the foregoing, Company can adjust the compensation levels company-wide at any time in the event it determines that macroeconomic conditions require overall changes to compensation or pricing.  Employee's commission rate can be adjusted or suspended at any time if Company has reason to believe that (i) Employee has breached his/her fiduciary duty to Company; (ii) Employee has violated any law, policy, procedure or acted improperly in regard to any transaction with a consumer; (iii) Employee is engaged in self-dealing, acting purely in his/her own interest without regard to and inconsistent with the interests of the Company and/or the consumer; or (iv) Employee commits a fraudulent act, including but not limited to intentionally misrepresenting the Company as to the authenticity of a loan application package.   In the event Employee engages in any dishonest or act of moral turpitude or that the Company has determined the Employee has caused a loss to the Company through a willful act or gross negligence, the Employee could be subject to suspension or termination.

## III.   **MANAGER REPRESENTATIONS**

A.  Manager verifies that no "non-compete" non-solicitation or confidentiality agreements with any other company, person or entity are binding upon him/her as of the date this Agreement.  Employee agrees he/she is not utilizing the confidential information obtained from a prior employer in performing any services on Company's behalf.

Manager is subject to disciplinary action including and up to Termination if Manager is found to (i) have knowingly and materially violated a written Company policy concerning the origination of loans (ii) Manager has breached his/her fiduciary duty to Company; (iii) Manager has violated any law, policy, procedure or acted improperly in regard to any transaction with a consumer; (iv) Manager is engaged in self-dealing, acting purely in his/her own interest without regard to and inconsistent with the interests of the Company and/or the consumer; or (v) Manager commits a fraudulent act, including but not limited to intentionally misrepresenting the Company  (vi) Manager engages in any dishonest or act of moral turpitude or that the Company has determined the Manager has caused a loss to the Company through a willful act or gross negligence.

B.  <u>Dual Employment Acknowledgement</u>

Employees, such as Managers, Loan Officers, Underwriters, Processors and other support personnel must work exclusively for VIP Mortgage Inc. and cannot work (even on a part time basis) for other lenders or other companies engaged in the real estate or financial industry at the same time they are working for VIP Mortgage Inc. This includes Real Estate Agents, Title companies and Financial Planners.

This also includes Self Employed entities such as S Corps, Corps, Sole Proprietors, LLCs, and any other form of income related activities that generate income from real estate, the mortgage finance business or a related field at the same time they are working for VIP Mortgage, Inc.  This does not

EXHIBIT "2"

include LLC's created solely for the purpose of owning real estate rental properties. Any licenses other than licenses registered through NMLS are required to be placed into inactive status. Employee will notify VIP Mortgage Inc. immediately of any activities that breach this rule as per HUD's requirements of VIP as a Full Eagle Lender.

C.  Non-Disparagement.  Employee agrees that he/she will not make any disparaging, harmful, false, or defamatory comments or statements about the Company or its affiliates, directors, members, managers, officers, employees, or agents regarding any of Company's products, services, or practices to anyone on the Internet including, but not limited to, on the social media websites: Facebook, Myspace, Twitter, LinkedIn, Instagram; in any publication; or in any public or private forum whatsoever.  Employee specifically agrees to refrain from making any disparaging, harmful, false, or defamatory comments or statements to Company's suppliers, vendors, or customers in the forums set forth in the preceding sentence, or in any public or private forum whatsoever.  The Parties agree that this provision is a material term of this Agreement.

## IV.  TERM

This Agreement will commence as of **January 1st 2020**, and will continue for a period of  six (6) months or the next scheduled renewal term which occurs on January 1st and July 1st of each year. This Agreement is subject to termination at the will of both parties at any time with or without cause with 30 days' written notice.  This Agreement shall be renewed upon identical terms and conditions at the conclusion of each year unless either party notifies the other in writing prior to such renewal.

A.      Employee further acknowledges that all leads provided to or worked on by Employee and loans in process are Employer's property.  Employee agrees to provide upon termination a written account of any and all open leads, business prospects, and/or loans in process as of the date of his/her termination, and agrees not to take any action to divert such loans to a competitor or away from Company.

B.      All final invoices must be promptly sent to Company for payment.

C.      All Company property, equipment and licenses must be promptly returned to Company.  In addition, Company information must be promptly removed from Manager's website and all Company signage promptly taken down.

D.      Severance.  In the event that Employee provides at least 30 days' notice of termination and has not engaged in a material breach of this Agreement, Manager shall be paid a severance equivalent to the amounts left in his Wind-Up Account.  The Wind-Up Account is (i) the remaining balance in the Branch Override funds, (ii) less any unpaid Branch Expenses attributable to Branch operations during the period of Manager's employment.  If any severance is due to Manager, it is payable within 30 days of the close of the Wind-Up Period (defined as 180 days following the termination date).

## V.    CONFIDENTIALITY

(a)      "Confidential Information" means any Company proprietary information, technical data, trade secrets, or know-how, including, but not limited to research, product plans, products, customer technical requirements, software, programming techniques, referral sources, marketing strategy, investor lists, services, suppliers, supplier lists, customers, customer lists, markets, developments, inventions, processes, technology, designs, drawings, engineering, apparatus, techniques, hardware configuration information, marketing, forecasts, business strategy, finances, or other business information disclosed by the Company, either directly or indirectly, in writings, orally, or by drawings or inspection of samples, parts or equipment, or made known as a consequence of agreement by the Company or Employee's endeavors while employed by the Company. Confidential Information does not include information that: (i) is in or enters the public domain without breach of this Agreement; (ii) is received from a third party without restriction on disclosure and without breach of a nondisclosure obligation; or (iii) is required to be disclosed by

January 2020            Initials                                                Page 5

EXHIBIT "2"

order of a court or other governmental agency, provided that the Company will first be given reasonable notice and opportunity to obtain a protective order against disclosure of such information.

**(b)**    As a material inducement to Employer to enter into this Agreement, Employee acknowledges that he/she will become intimately involved and/or knowledgeable in regard to Company's business and will be entrusted with Company's confidential information, both during his/her employment and after any termination thereof. Employee will not use Confidential Information for any purpose other than the performance of duties or disclose or cause to be disclosed Confidential Information to any third party.  Employee agrees that all Confidential Information will remain solely the property of the Company, and further agrees to take reasonable precautions to prevent disclosure of Confidential Information.

**(c)**    Employee agrees that he/she will not improperly use or disclose any proprietary information or trade secrets of any former or current employer or other person or entity with which Employee has an agreement or duty to keep in confidence such information, and that Employee will not bring onto the premises of the Company any unpublished document, sample, or proprietary information belonging to such employer, person, or entity unless consented to in writing by such employer, person, or entity.

Employee acknowledges that all tangible property, documents, files, electronic records or data, or records or materials of any sort pertaining to Company's business and or Technology platform, whether prepared by Employee or otherwise coming into Employee's possession or control, are the sole and exclusive property of the Company and that Employee has no right to keep or use such documents or things following termination of his/her employment.  Employee agrees that, upon any termination of employment, Employee shall not retain any such documents or things in his/her possession and will immediately return them to Company.

**(d)**    Employee recognizes that the Company has received and in the future will receive from third parties their confidential or proprietary information and Employee has a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes.  Employee agrees that he/she, the Company, and such third parties have a duty to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm, or corporation or to use it except as necessary in carrying out his/her responsibilities as an employee of the Company consistent with the Company's agreement with such third party.

**(e)**    Upon the Company's earlier request, Employee will deliver to the Company all of the Company's property or Confidential Information in tangible form that Employee may have in his/her possession or control, including any and all copies thereof.

## VI.    **NONCOMPETITION; NON-SOLICITATION**

**(a)    Noncompetition Restriction.**  During the term of this Agreement and for a period of one (1) year after the termination of this Agreement (the "Restricted Period"), Employee will not, without the prior written permission of the Company, which will be granted or withheld in the sole and absolute discretion of the Company for any reason, directly or indirectly, either as a consultant, employee, agent, officer, director, shareholder, creditor, partner, proprietor, joint venture, or other manner, assist any individual partnership, company, corporation, or other entity anywhere within the geographic boundaries of the United States of America (the "Restricted Area") in the design, development, manufacture, marketing, sale, lease, or licensure (including all types of governmental approvals) of any materials, content, products, or services competitive with those of the Company.

**(b)    Nonsolicitation Restriction.**  During the Restricted Period, Employee will not, whether with or without cause, either directly or indirectly: (a) call on, solicit, or take away any of the customers of the Company on whom Employee called or with whom Employee became acquainted

January 2020                  Initials _____                                              Page 6

EXHIBIT "2"

during the period of this Agreement, either for Employee's own benefit or for the benefit of any other person or entity; (b) solicit or take away, or attempt to solicit or take away, any employee of the Company, either for Employee's own benefit or for the benefit of any other person or entity.

        **(c)    Adjustment to Restrictions.** If a court of competent jurisdiction concludes that any covenant or provision of this Agreement is unenforceable according to its terms, either because of the duration of the Restricted Period or the scope of the Restricted Area, Employee and the Company agree that a court of competent jurisdiction will reduce the duration of the Restricted Period or the scope of the Restricted Area so that the resulting duration and scope will be the maximum that such court will conclude is enforceable. The reduction will be performed as follows: (i) in the case of the Restricted Period, the duration will be reduced by one month at a time until it will be the maximum enforceable duration; and (ii) in the case of the Restricted Area, such area will be reduced by eliminating individual states in the United States, each being reduced, one at a time, starting with the state farthest from the State of Arizona until such area will be the maximum enforceable geographical coverage.

## VII.  <u>SPEAR</u>

       *The Company has developed a customer relationship management tool known as SPEAR (the "Tool") which includes certain third party products and intellectual property.*
*The Company makes the Tool available to users via the Internet. The Company grants to the Employee a non-exclusive, non-transferable, non-sub licensable and limited right to access the Tool via the Internet and use of the Tool solely for (i) the purpose of Employee's employment or other relationship with the Company and (ii) only for the duration of the term of agreement or employment.*

       **(a)**    <u>Access to Tool</u>. Employee is provided a username and password to SPEAR which is exclusive to the Employee and is not to be shared with any individual or entity.

       **(b)**    <u>Restrictions on Use</u>. Employee will not, directly or through a third party: (i) provide access to the Tool by means of timesharing, hosting, application service provider, remote computing services, networking, batch processing, or by any other means; (ii) mirror or frame any part of the Tool or create any hyperlinks to the Tool that include user names, passwords, other log-in information, or secure cookies; (iii) transfer, sell, rent, assign, distribute, redistribute, lease, sub-lease, license, sub-license, or otherwise convey, in whole or in part, the Tool, or otherwise use the Tool in any way that involves service bureau use, outsourcing, concurrent use of a single Employee password or username, or timesharing of the Tool, or make the Tool available to or use the Tool on behalf of any third party; (iv) copy, adapt, translate, alter, maintain, enhance, disassemble, decompile, reverse engineer, create derivative works, or otherwise modify or attempt to discover any part of the source code underlying the Tool; (v) use the Tool for the purpose of building a similar or competitive tool, product, or service or for the purpose of obtaining unauthorized access to the Tool; (vi) use the Tool in a manner that is contrary to any law or in violation of any intellectual property rights or privacy rights, including, without limitation, using the Tool to store or transmit infringing, libelous, or otherwise harmful or tortious material; (vii) publish, post, upload or otherwise transmit anything to VIP or the Tool that contains any virus, Trojan horse, worm, time bomb, corrupted file, or other computer programming routine that is intended to damage or detrimentally interfere with information or property of another person or entity; (viii) use or knowingly permit the use of any security testing tools in order to probe, scan, or attempt to penetrate or ascertain the security of the Tool, except for executing Employee's own anti-virus procedures; (ix) take any action that may compromise or jeopardize VIP's intellectual property rights or otherwise interfere with or disrupt the integrity or performance of the Tool; (x) remove or deface any confidentiality, copyright, or other proprietary notice placed on the Tool or any other materials provided to Employee; (xi) make any representations or warranties to any third parties that could be construed as being representations or warranties from VIP in relation to the Tool or any other matter; or (xii) do any other thing in relation to the Tool specifically prohibited in this Addendum, in any documentation provided with the Tool, or otherwise communicated by VIP to Employee.

(c)    Ownership of Tool. Subject to the limited rights granted to Employee pursuant to this Addendum, VIP and, as applicable, its licensors, reserve all rights, title, and interest in and to the Tool and any other materials and data, information, and content provided to Employee pursuant to or in connection with this Addendum, including, without limitation, all related intellectual property rights, and further including all improvements, enhancements, modifications, upgrades, and derivative works, whether or not made in conjunction with this Addendum (collectively, "Improvements"). Employee assigns and transfers to VIP all worldwide rights, title, and interest, including all intellectual property rights, in and to the Improvements, without further consideration, free from any claim, lien, or rights of retention on the part of Employee. No implied licenses or any other rights are granted to Employee other than those expressly set forth herein.

(d)    Term & Termination. Upon the expiration or termination of employment, Employee agrees that it will immediately cease use of the Tool, uninstall any software provided by VIP or downloaded by Employee in connection with the Tool, and return to VIP all copies of software and any other materials (including, without limitation, documentation) provided by VIP to Employee in connection with the Tool. All provisions of this Addendum that by their nature are intended to survive the termination or expiration of this Addendum shall so survive, including, without limitation all property rights of the Parties.

(e)    Limitation of Liability. In no event will VIP be liable to Employee or any third party for any direct, special, incidental, consequential, exemplary or other similar damages, including, without limitation, lost profits or income, arising from the use of or inability to use the Tool, even if VIP has been advised of the possibility of those damages. VIP is not liable for any damages, whether direct or indirect, arising from or related to the actions or omissions of any third party, including, without limitation, any third party hosting the Tool or any third party content, products, services, or websites made accessible through the Tool. In no event (other than as may be required by applicable law) will VIP's total liability to Employee for all damages arising out of or related to this Addendum and/or Employee's use of or inability to use the Tool exceed the total Fees paid by Employee for use of the Tool in the six (6) month period prior to the date the liability arose.

## VIII.    FORUM/JURISDICTION

In the event that any litigation needs to be brought in connection with the enforcement, termination, interpretation or breach of this Agreement or any term hereof, the parties agree that any litigation between the parties may only be brought in federal district court in Arizona, or in the event subject-matter jurisdiction is lacking, in a Arizona State Court of competent jurisdiction. By execution of this Agreement, the parties are consenting to personal jurisdiction in Arizona limited to matters concerning the employment relationship between them.

## IX.    VOLUNTARY AGREEMENT

Employee acknowledges that he/she has been given sufficient time and opportunity to review, consider, and obtain advice in connection with the execution of this Agreement, and that Employee has not been forced to sign this Agreement, or any part thereof under duress.

## X.    MISCELLANEOUS

A.    Non-Waiver - No delay or failure by either party to exercise any right under this Agreement, and no partial or single exercise of that right, shall constitute a waiver of that or any other right, unless otherwise expressly provided herein.

B.    Severability - If any provision of this Agreement becomes or is found to be illegal or unenforceable for any reason, such clause or provision must first be modified to the extent necessary to make this Agreement legal and enforceable and then, if necessary, severed from the remainder of the Agreement to allow the remainder of the Agreement to remain in full force and effect.

C.  Captions - All captions, titles, headings and divisions hereof are for purposes of convenience and reference only, and shall not be construed to limit or affect the interpretation of this Agreement.

D.  The Loan Originator Compensation manual will become a part of this Agreement and must be followed by all sales personnel.  This manual is located in the Company CRM "SPEAR".

E.  Counterparts - This Agreement may be executed in counterparts and any and all such executed counterparts shall constitute a single agreement binding on each of the parties hereto.

F.  The Team Composition Addendum can be executed separately but will become a part of this Agreement at time of execution of all parties..

The 9 pages of this Agreement set forth the entire understanding and agreement of the parties hereto and fully supersedes any and all prior Producing Branch Manager Employment Agreement(s) or understandings between the parties with respect to the subject matter hereof. No prior negotiations or drafts of this Agreement shall be used by either party to construe the terms or to challenge the validity hereof.

*All terms of this Agreement become effective as of the date specified above.*

*Full-Time Loan Officer Employment Agreement executed on* _____12/16/2019_____ *by you in counterpart shall become part of this Agreement and constitute as a single binding Agreement on each of the parties hereto.*

IN WITNESS WHEREOF and intending to be legally bound hereby, the parties have read, understood and executed this Agreement the day and year above written.

**Hoolaea Andrade**

BRANCH MANAGER NAME-Printed

By: Signature _____

**V.I.P. MORTGAGE, INC.**

By: _____
Name:
Its:

EXHIBIT "2"

# EXHIBIT "3"



Ho'olaea Andrade
7340 N Via Camello Del Norte
Unit #241
Scottsdale, AZ 85258
808-960-0400 I hoo@pacificislelending.com

**1/5/24**

Dear Ho'o:

This letter confirms our discussion that your employment with V.I.P. Mortgage, Inc has ended effective immediately.

Included in this packet is a summary of your benefit options. This includes information on your options to continue health insurance, information on 401(k), and points of contact at V.I.P. Mortgage moving forward.

- **Equipment Return:** You will receive an email with a prepaid QR code directly from **FedEx.** Please return all equipment (laptop, power cords, docking station, monitors, desk phone, etc.) to the nearest FedEx office location. FedEx will package everything for you.
- **Cobra Administration** – iSolved Benefits 1-800-594-6957; Group ID CN92111
  - o Medical, Dental, Vision, and Critical Illness insurance end on the last day of the month
  - o All other benefits end on your day of separation
- **401(k)** – Our 401K will be in a blackout period until January while transitioning from BlueStar to Voya. You can request a withdrawal or rollover from the Voya platform once the plan is live in January. Website: www.voyaretirementplans.com; Plan Number: 862386, Plan Verification Number: 86238699; Customer Service: 800-584-6001 (Available 8am – 9pm ET)
- **Final Paycheck:** Will be paid all final wages within applicable state final pay timeframes.
- **PTO:** Per V.I.P. policy and the state of Hawaii, your unused PTO will not be paid out upon separation.

Please notify us of any address changes that may be different than the address above to ensure that you receive your COBRA notification and W-2 documents in a timely manner.

As previously noted on your offer letter and the Employee Handbook, your employment is "at will." This means you or V.I.P. Mortgage may terminate your employment at any time, with or without notice, and with or without cause. Lastly, you will be compensated for the full day today and will be paid all final wages within applicable state final pay timeframes.

Should you have further questions, please email hr@vipmtginc.com

We wish you the best in your future endeavors.

Sincerely,
Human Resources

## EXHIBIT "3"

IN THE CIRCUIT COURT OF THE THIRD CIRCUIT

STATE OF HAWAII

| | | |
|---|---|---|
| HOʻOLAEAKAWAIOPUA ANDRADE, | ) | CIVIL NO. _____ |
| | ) | (Other Tort Action) |
| Plaintiff, | ) | |
| | ) | VERIFICATION OF |
| vs. | ) | HOʻOLAEAKAWAIOPUA |
| | ) | ANDRADE |
| V.I.P. MORTGAGE, INC.; | ) | |
| JOHN DOES 1-10; JANE DOES 1-10; | ) | |
| DOE PARTNERSHIPS 1-10; DOE | ) | |
| CORPORATIONS 1-10; DOE | ) | |
| GOVERNMENTAL AGENCIES AND | ) | |
| DOE ENTITIES 1-10; | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **VERIFICATION OF HOʻOLAEAKAWAIOPUA ANDRADE**

I, HOʻOLAEAKAWAIOPUA ANDRADE, being first duly sworn on oath, deposes and states that:

1. I am the Plaintiff in the above-entitled action, and I have read the foregoing Verified Complaint.

2. The facts stated in the Verified Complaint are true and correct based upon my personal knowledge, except as to the matters herein stated to be alleged on information and belief, and as to those matters I believe them to the true.

3. Exhibits "1," "2," and "3," are true and accurate copies of my Employment Agreements (Exs. 1-2) and termination letter (Ex. "3.)

4. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Hilo, Hawaii, on __January 8__, 2026.

HOʻOLAEAKAWAIOPUA ANDRADE

Sworn to before me, this __8th__ day of
__January__, 2026.

Notary Public, State of Hawaii

Name: __Andrea B Engleman__
My Commission Expires: __6/23/29__

NOTARY CERTIFICATE ON NEXT PAGE



2

STATE OF HAWAII    )

County of Hawai')    SS.

      This is to certify that on this _8th_ day of _January_, 2026, before me, the undersigned Notary Public in and for the State of HAWAII, duly commissioned and qualified, personally appeared, HOʻOLAEAKAWAIOPUA ANDRADE, to me known to be the person described in and who executed within and foregoing VERIFICATION OF HOʻOLAEAKAWAIOPUA ANDRADE, and acknowledged to me that she signed the same as her free and voluntary act and deed, for the uses and purposes therein mentioned.

      IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year first above written.

Notary Public, State of Hawaii

Notary Name: _Andrea B Englerman_

My commission expires: _6/23/29_

**NOTARY CERTIFICATE**

Document Date: __JAN 0 8 2026__    No. Pages: 3

Name: _Andrea B Englerman_

Document Description:

**VERIFICATION OF HOʻOLAEAKAWAIOPUA ANDRADE**

Notary's Signature        JAN 0 8 2026

                          Date:

3